# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| ZACHARY MORGAN on behalf of himself and all others similarly situated, | Court File No.: 3:19-cv-00027 (SLC) |
| Plaintiff, | **DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION AND AUTHORIZATION OF NOTICE TO SIMILARLY-SITUATED PERSONS PURSUANT TO 29 U.S.C. § 216(B)** |
| v. | |
| CRUSH CITY CONSTRUCTION, LLC 879 U.S. Highway 63 Baldwin, Wisconsin 54002, | |
| Defendant. | |

## I.    INTRODUCTION

Defendant Crush City Construction, LLC ("Crush City") respectfully submits this Memorandum of Law in Opposition to Plaintiff's Motion for Conditional Certification and Authorization of Notice to Similarly-Situated Persons Pursuant to 29 U.S.C. § 216(b) [ECF 19] ("Motion").

Plaintiff Zachary Morgan ("Morgan") is a convicted felon who commenced this case while serving his period of incarceration for a felony burglary conviction for which he received an 8-year prison sentence. Many of the commutes he seeks compensation for in this lawsuit were from or to jail, which clearly make the circumstances of his employment unique and not suitable to class representation. Moreover, his claim itself is not supported by the law, and therefore, not suited for conditional certification. Crush City's policies were consistent with the requirements of the FLSA and Morgan's claims are without merit.

## II.  STATEMENT OF FACTS

**A.  PROCEDURAL HISTORY.**

On January 21, 2019, Plaintiff filed the Amended Complaint alleging Crush City

failed to compensate workers for travel time, and failed to include non-discretionary

compensation in employees' regular rates of pay for overtime calculation purposes.

Plaintiff originally defined the putative classes as:

FLSA Collective (Travel Time): All hourly-paid, non-exempt employees in
the positions of Laborer, Technician, Foreman, and Crew Leader who are or
have been employed by Defendants within three (3) years immediately prior
to the filing of the Complaint, (ECF No. 1), and this Amended Complaint,
and who have not been compensated for all hours worked in excess of forty
(40) hours in a workweek as a result of Defendants' failure to compensate
said employees for compensable travel time during the work day.

FLSA Collective (Non-Discretionary Compensation): All hourly-paid, non-
exempt employees in the positions of Laborer, Technician, Foreman, and
Crew Leader who are or have been employed by Defendants within three (3)
years immediately prior to the filing of the Complaint, (ECF No. I), and this
Amended Complaint, and who received non-discretionary forms of
compensation in addition to regular wages that were not included in their
regular rates of pay for overtime calculation purposes.

[ECF 4, p.21 ¶ 85].

The parties stipulated to the dismissal of Lindus Construction, Inc. as a

defendant. [ECF No. 18.].  Lindus Construction, Inc. was dismissed from this matter on

July 18, 2019.  [ECF No. 33].

The parties have taken five (5) depositions, and exchanged almost two thousand

pages of documents.

1.    __The Scope of the Plaintiff's Motion Filed in July 2019__.

On July 14, 2019, Plaintiff filed the Motion asking the Court to conditionally certify the following putative class:

> Travel Time Collective: All hourly-paid, non-exempt Technician Employees in such positions as Laborer, Technician, Foreman, and Crew Leader who were employed by Defendant within the three (3) years prior to this action's filing who have not been compensated for all hours worked in excess of forty (40) hours in a workweek as a result of Defendant's failure to compensate said employees for compensable travel time during the workday.

> Non-Discretionary Compensation Collective: All hourly-paid, non-exempt Technician Employees in such positions as Laborer, Technician, Foreman, and Crew Leader who were employed by Defendant within the three (3) years prior to this action's filing who have not been compensated for all hours worked in excess of forty (40) hours in a workweek at the proper, correct, and/or lawful overtime rate of pay as a result of Defendant's failure to include all non-discretionary forms of compensation, such as performance bonuses, in said employees' regular rates of pay for overtime calculation purposes.

**B.    CRUSH CITY CONSTRUCTION.**

Crush City is a family-owned construction company headquartered in Baldwin, Wisconsin that provides construction, remodeling, siding, roofing, decking, and gutter services in Minnesota and Wisconsin.  [ECF No. 27, Deposition of Jill Larson ("Larson Dep.") 49:14–17].   Crush City has six construction departments where it employs technician servicers and laborers and foremen: Roofing, LeafGuard Gutters, Decking, Addition and Remodel, Siding, and Windows and Doors.  (Larson Dep.  35:14–21, 39:7–25).  The Roofing Department consists of mostly independent subcontractors, but there is one metal roofing crew with two workers.  (Larson Dep. 77:24–78:4).  The LeafGuard Gutter Department has nine (9) or ten (10) two-man crews.  (Larson Dep. 48:1–4).  The Decking Department has four (4) two-man crews (Larson Dep. 48:3–4).  The Additions

and Remodels Department consists of two (2) two-man crews.  (Larson Dep. 48:11–14).

The Siding Department has three (3) four-man crews.  (Larson Dep. 78:14–15).  The

Siding Department has sub-departments: Siding and Tear-off.  (Larson Dep. 110:11;

Morgan Dep. 67:16–21).  The Windows and Doors Department has five (5) two-man

crews.  (Larson Dep. 48:5–6).  Each department has a different manager.  (Larson Dep.

50:6–10).  Each crew has a foreman, also known as a crew leader.  (Larson Dep. 38:2–3).

Crush City utilizes Salesforce software for employee timekeeping and

communication of work assignments.  (Larson Dep. 62:5–7, 80:23–25).  Salesforce

enables technicians to see their job assignments and to record their work hours remotely.

(Larson Dep. 80:7–10, 19–21).  The LeafGuard Gutter Department and the Windows and

Doors Department are paid on a piecework system.  (Larson Dep. 72:3–23).  The other

construction departments are paid by the hour.

Crush City's vendors deliver most construction materials to its job sites.  (Larson

Dep. 80:8–10).  Accordingly, it is not customary for technicians and crew leaders to report

to the shop daily.  (Larson Dep. 80:19–21).  However, each department has a weekly

meeting at the Baldwin, Wisconsin shop, typically on Monday.  (Laron Dep. 100:8–16;

101:8–13).  There is an all-company meeting on the second Wednesday of every month.

(Larson Dep. 101:17-19).  Employees are paid for attending those meetings and

subsequent travel time to the job site regardless of whether driving or riding.  (Larson Dep.

102:22-103:4, 105:22-26, 130:22-131:15).

Crush City provides technicians the opportunity to use company vehicles for

transportation to job sites.  (Larson Dep. 76:13–15).  Crush City then pays for gasoline and

4

maintenance of company vehicles. (Larson Dep. 82:16–19). Crush City's insurance company determines what employees may be entrusted with a vehicle. (Larson Dep. 76:9–12). Each department has various company vehicles assigned to it. For instance, the Roofing Department has one vehicle. (Larson Dep. 77:24–78:9). The Siding Department has six vehicles. (Larson Dep. 78:23–25). Typically, the crew leader is assigned the company vehicle. (Larson Dep. 79:8–9). The technicians who do not have a company vehicle can either meet up with whoever is driving the company vehicle (at a shop or a ride share location) or they can drive their own vehicle to the job site. (Larson Dep. 79:1–5).

Every employee receives a copy of Crush City's vehicle policy/agreement, and Crush City's written drive-time policy. (Larson Dep. 84:22–23, 96:25–96:4). Department managers have the responsibility of discussing the drive time policy with their employees. (Larson Dep. 95:15–19). The policy specifically allows employees, both drivers and riders, to claim paid drive time on their time cards if they attend a scheduled meeting at the shop and then travel to a jobsite. (Larson Dep. 88:23–25) [Doc. 23-8]. Employees may also claim drive time on their time cards if they report to the shop and load or unload materials from the company vehicle. (Larson Dep. 89:23–90:2). Technicians are allowed to claim drive time if they pull a trailer to a job site, but this mostly occurs in the Window and Door Department, because they must transport windows that are sprayed at the shop. (Larson Dep. 102:8–17). If technicians in another department pick up materials or receive instruction in the shop before travelling to the job site, then those employees are allowed to claim drive time to the job site. (Larson Dep. 103:5–104:6). However, Crush City

typically tries to limit instruction-giving to one technician that can then communicate that instruction to the rest of the crew at the job site. (Larson Dep. 103:11–13). If more than one technician had to receive the same instructions, or if took two people to load a vehicle, then both technicians can claim drive time from the shop to the job site. (Larson Dep. 103:15–21).

Technicians are responsible for entering their own time into Salesforce, and they record their shop time, unpaid meal breaks, and drive time separately. (Larson Dep. 67:12–14, 67:21–68:5, 70:3–8, 106:14–18). While managers do review technicians' time entries, there is no way for Crush City to determine who drove to a work site that day unless an employee included drive time on their time card. (Larson Dep. 106:1–18, 111:19–21, 115:12–13).

Crush City offers various bonuses that vary from department to department. (Larson Dep. 72:1–5). Managers develop the bonus systems for each department along with Crush City owner, Adam Lindus. (Larson Dep. 73:14–16).

## C.   PLAINTIFF'S BACKGROUND.

Morgan has been convicted of so many crimes he could not even remember all of the convictions at his deposition. [ECF No. 24 Deposition of Zachary Morgan ("Morgan Dep.") 16:4–16]. Particularly notable for the purposes of this motion, Morgan admitted that he had been convicted of witness intimidation. (Morgan Dep. 16:13). The other conviction particularly relevant to the present motion is Morgan's conviction for burglary and theft. (Morgan Dep. 17:7–8). As a result of that conviction Morgan was sentenced to eight (8) years of prison with seven withheld. (Morgan Dep. 18:13–14). He served two

and one-half (2.5) months in jail, followed by 9.5 months of house arrest and then is on probation for five years.  (Morgan Dep. 18:13–20:20).  If he violates probation, he will have to serve the entire remaining seven-year prison term.  (Morgan Dep. 18:14–15).

Morgan was still under house arrest for felony theft when he commenced this case. That period of confinement ended on June 1, 2019, just before the present motion was brought (Morgan Dep. 18:20–24).  He is currently on probation for felony theft.  (Morgan Dep. 18:13–24).

**D.    MORGAN'S WORK HISTORY WITH CRUSH CITY.**

**1.    <u>Tear-Off Technician.</u>**

Morgan's employment with Crush City commenced on or about May 15, 2017. (Morgan Dep. 75:10–14).  He was hired as a siding tear-off technician.  (Morgan Dep. 78:2–4).  After a two-week training period Morgan was assigned to a siding tear off crew. (Morgan Dep. 79:25–80:3).  He stayed in that role for between 90 to 100 days.  (Morgan Dep. 80:9–15).  During that 90 to 100 day period he may have driven a few times, but generally did not drive.  (Morgan Dep. 82:3–6).  His work involved reporting to individual house worksites, tearing the siding off, wrapping the home, repairing any rotten wood and scraping the caulking off the windows.   (Morgan Dep. 82:18–83:5).   According to Morgan's testimony, he would travel to the Crush City shop each day for work.  (Morgan Dep. 87:23–88:2).  He does not remember during that period when he would enter the start of his day for purposes of his time card.  (Morgan Dep. 91:18–20; 92:14–17).  Likewise, he did not recall when he would end his workday on his time card.  (Morgan Dep. 92:20–25).

7

2.    **Tear-Off Crew Leader (Before Driving Son to work and Before Incarceration).**

After the end of the 100-day period Morgan was promoted to the position of Tear-Off Crew Leader.  (Morgan Dep. 95:8–12).  In his new role he received a company van.  (*Id.*).  He was allowed to take the company van home at night.  (Morgan Dep. 95:13–14).  This occurred approximately in August, 2017.  (Morgan Dep. 94:20–95:12).  During that period from August, 2017 until June 1, 2018 when he was serving his one-year sentence, he would do 95% of the driving for his crew.  (Morgan Dep. 99:12–15).  Morgan concedes that he would be paid for drive time when he "picked up materials from the shop or if I was bringing trash or materials home from the job site at the end of the day or if I was doing service calls, which didn't happen very much at all."  (Morgan Dep. 100:14–20).  While Morgan could not remember how often those things occurred, he confirmed that he believes he was paid for drive time under those circumstances.  (Morgan Dep. 101:7–12).  Morgan further confirmed he had no idea how many times he was paid for drive time.  (Morgan Dep. 102:6–7).

Sometimes Morgan would drive to the shop at the start of the workday and sometimes he would pick people up at their homes or sometimes he would pick them up at commuter ride shares located on the interstate before going to the worksites.  (Morgan Dep. 104:14–15).  In responding to the question who arranged all of that, Morgan responded "Supervisor and then us, our crew.  I was told my first day of employment that I needed to be at the shop or a ride share to hop in with my foreman or the van that we were taking.  Every other employee that I had mentioned had also been told that they need to be at the

shop" or "a ride share." (Morgan Dep. 104:18–105:1).   When pressed about what determined where people were picked up, Morgan testified, "The job, people's distance from home, I guess." (Morgan Dep. 106:4–5).

### 3.   Tear Off Crew Leader (Driving own son to job sites).

In June, 2017 Morgan's son, Hunter Smith began his employment with Crush City. [ECF No. 26, Deposition of Hunter Smith ("Smith Dep.") 65:4–8].   He became part of Morgan's tear off crew in approximately August of 2017.  (Smith Dep. 74:6–7; Declaration of Martin Kappenman ("Kappenman Decl.") ¶ 2, Ex. A).  The two lived in the same home. (Morgan Dep. 6:7–10).  A portion of the drive time sought by Morgan in this suit is for driving his own son to work from their shared home.  (Morgan Dep. 112:10-23).  Hunter Smith and Morgan worked on the same crew while living together for the period of mid-August, 2017 to January 26, 2018.  (Smith Dep. 84:17–85:24).

### 4.   Employment During Incarceration.

Morgan began his term of imprisonment on June 1, 2018.  (Morgan Dep. 97:23–98:1).  His confinement was transferred from the St. Croix County Jail to house arrest in mid-August, 2018.  (Morgan Dep. 55:17–18).  He remained under house arrest for the duration of his employment with Crush City.  (Morgan Dep. 19:1–5).

During the period of his incarceration at the St. Croix County Jail he was picked up by co-workers.  (Morgan 23:18–24:1).  Morgan set this up himself—he asked Zach Iverson and Mitchell Larson to pick him up.  (*Id.*)  The two co-workers would pick Morgan up at jail in the Crush City vehicle.  (Morgan Dep. 23:18–24:4).  Morgan could not recall where his coworkers would get the Crush City vehicle at the start of the day.  (Morgan Dep.

27:13–16).  When asked to walk through a typical workday during that period, Morgan responded as follows, "There's many variables in that.  I can't give you - - everything is different.  Houses are different.  The setup is different.  There's not a typical workday." (Morgan Dep. 32:3–7).  He confirmed that this was true for all Crush City employees. (Morgan Dep. 32:8–11).  He testified that during the period of his incarceration, the co-workers would generally have already picked up any necessary supplies before he was picked up.  (Morgan Dep. 32:25–33:4).

In late July or August of 2019 there was a change and a new co-worker, Reid Filiatreaux, was assigned to Morgan's crew.   (Morgan Dep. 34:24–35:6).   Because Filiatreaux did not have a valid driver's license, at the end of the workday Morgan would drive the Crush City vehicle to Filiatreaux's house, then take Filiatreaux's personal vehicle to the jail for the night.  (Morgan Dep. 36:10–15).  The next morning Morgan would drive Filatreaux's personal vehicle from jail to Filatreaux's home, where the two would then get into the Crush City vehicle and travel to the job site.  (Morgan Dep. 42:11–14).  Morgan was released from jail as a result of the death of his mother-in-law and his incarceration was converted to house arrest.  (Morgan Dep. 61:12–18).  He took several weeks off from work, then returned to Crush City.  He quit Crush City on September 28, 2018 to take work with another construction company.  (Morgan Dep. 64:2-65:6; 140:7–9).

## E.   HUNTER SMITH TESTIMONY.

Smith began working for Crush City on June 27, 2017.  (Smith Dep. 65:2–8; Kappenman Decl. ¶ 2, Ex. A).  Smith heard about the job from Morgan, who told Smith it

was a good place to work.  (Smith Dep. 17:19–21).  Smith enjoyed his time working for Crush City, and Crush City treated him well.  (Smith Dep. 17:23–18:1).

### 1. **Decking Department**.

Smith started out in the Decking department.  (Smith Dep. 20:8–11).  He was in the Decking department for just under two months.  (Smith Dep. 20:8–9).  No supervisor ever instructed Smith how to get to work.  (Smith Dep. 32:6–14).  Smith did not have his own vehicle at that time.  (Smith Dep. 21:12–13).  Morgan arranged for Smith to ride to the shop with him.  (Smith Dep. 21:2–12).  They rode in Morgan's personal vehicle to the shop.  Then Smith would ride to the decking job site with his foreman, Randy, and another decking crew member.  (Smith Dep. 20:8–23).  The fourth decking crew member, Thomas, would sometimes get picked up by the decking foreman at a ride share site, and sometimes he would arrive at the shop and then ride with the crew to the job site.  (Smith Dep. 23:21–24:8).  Smith was not sure why Thomas sometimes went to the shop and sometimes went to a ride share location.  (Smith Dep. 24:4–8).

On the Decking crew, Smith worked building decks at residences.  (Smith Dep. 24:21–23).  At the end of the day the crew would pack up the job site, and then his foreman would drop off Thomas at a ride share, and then drop Smith back off at the shop.  (Smith Dep. 25:22–26:3).  Smith would just wait for Morgan at the shop.  (Smith Dep. 26:2–3).

Smith's foreman in the Decking Department, Randy, instructed Smith to claim his drive time when he was riding in the van.  (Smith Dep. 50:16–51:10).  He got paid for all of the time he recorded for the month and a half he worked Decking.  (Smith Dep. 51:19–22).  Smith then testified that there was a company meeting regarding drive time.  (Smith

Dep. 52:6–9).  Smith testified they all "got yelled at" and then was told they could only claim drive time unless he was hauling material to or from the shop.  Otherwise, only the driver could claim drive time.  (Smith Dep. 50:15–22).  Smith said he had "no clue what was going on. I was just doing what I was told to do." (Smith Dep. 52:4–5).  When asked what specifically was said at the meeting, he said, "I can't remember . . . It was just brought up that drivers could only claim the drive time, or something along those lines." (Smith Dep. 52:20–25).  He could not recall any more detail from the meeting than that.  (Smith Dep. 53:1–3).

### 2. **Siding Department.**

At his request, Smith was transferred to the Siding Tear-Off Department in mid-August, 2017.  (Smith Dep. 76:11–14; Kappenman Decl. ¶ 2, Ex. A).  Shortly after that, Morgan was promoted to foreman, when he gained access to a Company van that he drove from work to home, and also used to transport Smith to work.  (Smith Dep. 21:7–16).

Smith was under age twenty-one while working for Crush City.  Because of his age, he was only supposed to drive company vehicles in emergencies.  (Smith Dep. 99:24–100:3).  Smith testified his Siding Tear-Off crew members often did not want to drive, so Smith ended up driving, even though he knew he was not supposed to.  (Smith Dep. 100:3–25).  Smith did not address this issue with his manager.  (*Id.*).  During most of the period when Smith was working in Siding, there were two vans allotted to the 3-4 person tear-off crew.  (Smith Dep. 40:11–15).  The crew just decided amongst themselves who would drive each day.  (Smith Dep. 39:15–16).

Smith testified that it was Morgan who informed him whether or not he had to go to the shop in the morning, not a supervisor. (Smith Dep. 101:20–102:8). Smith testified that Morgan was the one who told him how to enter his time, and whether or not to enter drive time. (Smith Dep. 61:23–25). Smith never asked a Siding supervisor about how to enter drive time and only relied on Morgan's direction. (Smith Dep. 61:16–62:9). The written drive time policy never changed while he worked for Crush City. (Smith Dep. 99:5–9). Smith rarely transported materials from the shop to job sites at the beginning of the day, and rarely transported trash from job sites back to the shop at the end of the day. (Smith Dep. 97:22–98:11). However, when he did transport material to or from the job site, he did claim, and was paid for, drive time. (Smith Dep. 53:17–19).

Smith testified he was told he could not claim drive time from the shop to the job site after department or monthly meetings. (Smith Dep. 58:19–59:1). Morgan told Smith he could not claim drive time after meetings at the shop. (Smith Dep. 59:2–3). Smith also claims he heard the same thing from Ben Miller, "That only the driver can claim time and only the driver can claim time if he was hauling materials or such and such like that." (Smith Dep. 59:5–8). He later testified he had heard a rumor that only a foreman could claim drive time, but he could not recall anyone actually telling him that. (Smith Dep. 59:21–60:3). Smith also later clarified that he never actually talked to Ben Miller about drive time. (Smith Dep. 63:3–4). Morgan would speak to Miller. (Smith Dep. 62:1–8).

Smith testified that he does not want to sue Crush City. (Smith Dep. 91:7–12). He does not know one way or the other whether Crush City owes him any money. (Smith Dep. 92:2–5). Smith never claimed drive time on his time card for which he was not paid.

13

(Smith Dep. 59:18–21).  He does not have a dispute with Crush City regarding his payment.  (Smith Dep. 91:7–9).  Smith did not provide any testimony regarding whether he received nondiscretionary (or other) bonus payments.

Smith also testified that while he did sign a declaration for this case, it contains inaccuracies: Smith never talked directly to Mark, and he typically would not go to the shop in the morning if they had gone to the shop the night before.  (Smith Dep. 93:25–95:12).  Smith acknowledged that his signature on the declaration he filed with the court looks completely different from his multiple signatures on his Crush City employment documents.  He explained this suspicious circumstance away by stating his signature has now "completely changed".  (Smith Dep. 92:19–93:6).

Crush City terminated Smith's employment on January 26, 2018, for failure to call or show up to work on January 25 or 26th.  (Smith Dep. 84:21–85:24).  Smith then found work at Pember Companies.  (Smith Dep. 71:11–13).  He was fired from that job in May 2019.  (Smith Dep. 71:16–19).  He has not found new employment because he is awaiting sentencing for one of two charges against him for fourth degree sexual assault, from which he expects jail time.  (Smith Dep. 8:8–11, 11:4–9, 71:23–72:3).

## F.   RANDY PRESSLEY TESTIMONY.

Randy Pressley ("Pressley") worked for Crush City for three weeks.  [ECF No. 25 Deposition of Randy Pressley ("Pressley Dep.") 9:12–13].  He started on October 23, 2017 and Crush City terminated his employment on November 14, 2017.  (Pressley Dep. 20:16–21:8, 21:18–22:1).  He worked in the Siding Tear-Off Crew with Morgan and Smith.  (Pressley Dep. 13:25–14:2, 15:21).  Pressley would drive his personal vehicle to the shop

everyday, and then drive a Lindus vehicle to the job site, where he met Morgan and Smith. (Pressley Dep. 13:18–14:2). Ben Miller would text message Pressley address of the work site, so he knew where to go. (Pressley Dep. 14:22–15:3). Pressley was not approved through Crush City's insurance, so he was not eligible to take the company vehicle home. (Pressley Dep. 13:4–7). If he had been on the company's insurance, he would have been able to drive the company vehicle home, and then just go straight to the job site versus picking up the company van from the shop. (Pressley Dep. 15:4–10).

While working on the Siding Tear-Off Crew, Pressley rarely unloaded work material from the company vehicle at the shop, and he testified that his signed Declaration was inaccurate. (Pressley Dep. 27:2–22). They rarely hauled trash back from the job sites because the trash would go in the dumpster at the job site. (Pressley Dep. 27:23–28:4).

Pressley did not understand the Salesforce app used to enter his work time. (Pressley Dep. 17:1–5). He had Ben Miller help him fill out his time. (Pressley Dep. 17:10–18). Pressley admits receiving the company Drive Time Policy. (Pressley Dep. 22:25–23:7). Ben Miller informed Pressley that he could only claim drive time on his time card if he was hauling trash or materials. (Pressley Dep. 31:13–19).

Pressley did not provide any testimony regarding whether he received nondiscretionary (or other) bonus payments. His wages did not include bonus payments, and he was not paid anything beyond an hourly wage. (Pressley Dep. 22:19–24). He does not want to sue Crush City. (Pressley Dep. 19:15–20). He believes he only agreed to be a witness. (Pressley Dep. 19:13–23, 29:13–24). Pressley does not believe Crush City

15

shorted his paycheck.  If anything, Pressley said he may have filled out his time card incorrectly.  (Pressley Dep. 19:24–20:9).

## III.   LEGAL ANALYSIS

## A.   CONDITIONAL CLASS CERTIFICATION SHOULD BE DENIED.

Plaintiff asks the Court to conditionally certify two separate collectives:

Travel Time Collective: All hourly-paid, non-exempt Technician Employees in such positions as Laborer, Technician, Foreman, and Crew Leader who were employed by Defendant within the three (3) years prior to this action's filing who have not been compensated for all hours worked in excess of forty (40) hours in a workweek as a result of Defendant's failure to compensate said employees for compensable travel time during the workday.

Non-Discretionary Compensation Collective: All hourly-paid, non-exempt Technician Employees in such positions as Laborer, Technician, Foreman, and Crew Leader who were employed by Defendant within the three (3) years prior to this action's filing who have not been compensated for all hours worked in excess of forty (40) hours in a workweek at the proper, correct, and/or lawful overtime rate of pay as a result of Defendant's failure to include all non-discretionary forms of compensation, such as performance bonuses, in said employees' regular rates of pay for overtime calculation purposes.

Plaintiff fails to meet his evidentiary burden, is uniquely unqualified to serve as a class representative and the Motion should be denied.

### 1.   Conditional Class Certification Standard.

The FLSA allows for collective actions to proceed in order for one or more employees to recover "for and in behalf of himself . . . and other employees similarly situated."  29 U.S.C. § 216(b).  Unlike in a "class action", collective action "class" members must opt-in to the litigation by giving their written consent.  *Id.*; *see also Austin v. CUNA Mut. Ins. Co.*, 232 F.R.D. 601, 605 (W.D. Wis. 2006); *compare* Fed. R. Civ. P. Rule 23.  Since the FLSA requires the affirmative action of opting-in, the Court has

discretion to authorize – and facilitate – the notice of the collective action to putative class members. *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 169 (1989); *Austin*, 601 F.R.D. at 605.

### a.   The Two-Stage Approach.

Since the FLSA does not define "similarly situated," courts generally apply a two-stage approach to determine whether a collective action should be authorized and facilitated. *See, e.g.*, *Adair v. Wis. Bell, Inc.*, No. 08-C-280, 2008 WL 4224360, at *3 (E.D. Wis. Sept. 11, 2008); *Austin*, 232 F.R.D. at 605 (collecting cases applying the majority, "two-step," approach). During the first step, the court must determine whether the plaintiff has demonstrated a "reasonable basis" for believing that she is similarly situated to potential class members. *Adair*, 2008 WL 4224360, at *3. "Courts have held that plaintiffs can meet their burden by making 'a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law.'" *Id.* Then, typically upon a defense motion for decertification at the close of discovery, the court proceeds to step two, at which point it must determine whether plaintiffs who have opted in are, in fact, similarly situated. *See Kelly v. Bluegreen Corp.*, 256 F.R.D. 626, 629 (W.D. Wis. 2009); *Kasten v. St. Gobain Performance Plastics Corp.*, 2008 WL 2262076, *14 (W.D. Wis. June 2, 2008).

The lenient interpretation standard, however, has sometimes been supplanted by a more rigorous examination standard if there has been more extensive discovery allowed to the plaintiff. *Soto v. Wings 'R US Romeoville, Inc.*, No. 15-CV-10127, 2016 WL 4701444, at *6 (N.D. Ill. Sept. 8, 2016). When a plaintiff seeks conditional certification of

a FLSA class after significant discovery, the court can "collapse the two stages of the analysis and deny certification outright." *Hawkins v. Alorica, Inc.*, 287 F.R.D. 431, 439 (S.D. Ind. 2012) (citing *Purdham v. Fairfax Cnty. Pub. Schs.*, 629 F.Supp.2d 544, 547 (E.D. Va. 2009). At this in-between stage, when substantial discovery has taken place—and where Defendant believes the parties here currently find themselves—an intermediate level of scrutiny is applied. *Hawkins*, 287 F.R.D. at 431 (citing *Scott v. NOW Courier, Inc.*, No. 1:10-cv-971, 2012 WL 1072751, at *7–8 (S.D. Ind. Mar. 29, 2012).

A court deciding whether to apply an intermediate level of scrutiny to a motion for conditional certification after discovery has begun should consider factors that include the "length of discovery, amount and kind of documents exchanged, number of depositions taken, and the extent other factual material has been made part of the record," as well as whether the defendant has disclosed a list of employees who may qualify for the prospective class. *Miller v. ThedaCare Inc.*, No. 15-CV-506, 2016 WL 4532124, at *7 (E.D. Wis. Aug. 29, 2016); *see also Freeman v. Total Sec. Mgmt.–Wis., LLC*, No. 12-CV-461, 2013 WL 4049542, at *4 (W.D. Wis. Aug. 9, 2013) ("An intermediate standard may be appropriate when a court has expressly allowed 'discovery on the issue of whether the plaintiffs are similarly situated' and the plaintiffs have been given access to a 'list of other . . . potential members of the proposed class.'" (alteration in original) (quoting *Bunyan v. Spectrum Brands, Inc.*, No. 07-CV-0089, 2008 WL 2959932, at *4 (S.D. Ill. July 31, 2008))).

Under this intermediate approach, the lenient standard of step one is somewhat more stringent to require the plaintiff to present evidence that potential plaintiffs

are similarly situated both in being subject to an unlawful compensation plan and in their job duties and circumstances. *Kurgan v. Chiro One Wellness Ctrs. LLC*, No. 10–cv–1899, 2014 WL 642092, at *3 (N.D. Ill. Feb. 19, 2014). As considerable discovery has already taken place, Defendant urges the Court to use the intermediate approach to determine whether Morgan is similarly situated to other potential class members. The parties have taken five depositions, and the parties have exchanged almost two thousand documents.

### b.    Conditional Certification Is Not Automatic.

Even with the lenient standard at the initial stage, conditional certification is not automatic:

> The "modest factual showing" standard "is not a mere formality. Rather, it serves as an important and functional step in the certification process. Where the plaintiff has not made at least a modest factual showing that certification is appropriate, "[i]t would be a waste of the Court's and litigants' time and resources to notify a large and diverse class only to determine that the matter should not proceed as a collective action because the class members are not similarly situated."

*Adair*, No. 08-C-280, 2008 WL 4224360, at *3–4. As argued below, what Plaintiff has alleged is that at most, he misunderstood Defendant's drive time policy, and that one low-level supervisor of one of Defendant's many departments may have been misinformed.

### 2.    <u>Morgan Is not a Proper Class Representative.</u>

The federal courts have repeatedly recognized that an individual's criminal history can render that person an inadequate class representative. *See Sloane v. Gulf Interstate Field Servs., Inc.*, 2017 WL 1105236 (M.D. Penn., Mar. 24, 2017). In *Sloane* the Court recognized the long history of assessing the suitability of certification in light of the plaintiff's criminal record. *Id.* at 23 (acknowledging that "courts have looked to factors

19

such as the representatives' honesty, conscientiousness, and other affirmative personal qualities.").  In *Sloane* the plaintiff was found unsuitable for class representation because of a burglary charge that occurred during an alcoholic blackout, and a criminal mischief conviction. (*Id.* at 23).   Those crimes in *Sloane* were less serious in nature and further separated in time from the case then is present here with Morgan.

Certification has been repeatedly denied in circumstances where the criminal conduct of the plaintiff was similar or far less severe than the extensive serious criminal record of Morgan, which by his own admission, included witness intimidation and felony theft convictions.   See *Weisman v. Darneille*, 78 F.R.D. 669, 671 (S.D.N.Y. 1978) (conviction at issue in rejection as class representative resulted in in no incarceration and mere $5,000 fine); *Kirkpatrick v. Ironwood Commc'ns, Inc.*, No. C05-1428JLR, 2006 WL 2381797 (W.D. Wash. Aug. 16, 2006) (representative held to be inadequate where he had seven felony convictions and theft and fraud convictions); *Davidson v. Citizens Gas & Coke Utility*, 239 F.R.D. 225, 228 (S.D. 2006) (felony burglary and theft convictions); *Maddox & Starbuck Ltd. v. British Airways*, 97 F.R.D. 395, 396–97 (S.D.N.Y. 1983) (unrelated criminal conviction resulted in lead plaintiff being ineligible to serve as class representative).

### 3.   Similarly Situated Analysis.

#### a.   Legal Framework.

The initial phase requires the plaintiff to produce "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." *Weninger v. Gen. Mills. Ops. LLC*, 344 F.Supp.3d 1005, 1008 (E.D. Wis. 2018).   The

plaintiff must provide admissible evidence that the potential class members are sufficiently similar that a collective action will facilitate efficient resolution of common questions and common answers. *Ruis v. Servo, Inc.*, No. 10-cv-394, 2011 WL 7138732, *4–10 (W.D. Wis. June 9, 2011). To determine whether the plaintiff has met this initial burden, courts rely on the complaint and affidavits submitted by both parties. *Fosbinder-Bittorf v. SSM Health Care of Wis., Inc.*, No. 11-CV-592-WMC, 2013 WL 3287634, at *4 (W.D. Wis. Mar. 21, 2013). Conditional certification analysis does not require the court to make any findings of fact, nor does the court need to make credibility determinations with respect to the evidence presented. *Goplin v. WeConnect, Inc.*, No. 17-cv-773-jdp, 2018 WL 6421064, at *3 (W.D. Wis. Dec. 6, 2018). However, even assuming all of Plaintiff's "facts" as true, he cannot establish a colorable basis that he is "similarly situated" to other Technicians.

> **b. Plaintiff has Not Carried his Burden to Show that He was A Victim of an Unlawful Policy or Practice to Deny Technicians Payment for Drive Time.**

Plaintiff's main allegation is that he and the putative class members—basically all of Crush City's hourly non-exempt employees from all departments—were required to report to the shop both in the morning before going out to a job site, and after finishing work at the job site. There is no evidence that Defendant required all of its technicians across all departments to report to the shop both in the morning and after finishing at the job site every day.

Morgan has not carried his burden of making even "a modest factual showing . . . that he and potential plaintiffs together were victims of a common policy or plan that violated the law." *Kelly*, 256 F.R.D. at 629–30. In fact, Morgan has not pointed to a single

written company policy requiring technicians to report to the shop before and after working at job sites, without recording drive time.  Defendant provides a written copy of its actual "Drive Time Policy" [Doc 23-8] to all new hires.  (Morgan Dep. 181:20–182:4; Smith Dep. 61:3–10; Pressley Dep. 23:1–7).  The Drive Time Policy details what is compensable drive time, and does not require employees to report to the shop in the morning and afternoon. [Doc 23-8].  In fact, it specifically mentions employees' ability to drive right to the job site without first going to the shop.  (*Id.*)  Larson also testified that although the Company does provide vehicles as a benefit to certain foremen, not every employee receives a company vehicle to use.  (Larson Dep. 82:19–19).  The crew members that do not receive a company vehicle have the option to ride to job sites with the crew foreman in the company vehicle, or they may drive to the job site themselves.  (Larson Dep. 78:11–12).  Crush City did not require carpooling from the shop or picking up employees from ride share locations. (Larson Dep. 79:1–5).

There is no need for technicians to come to the shop daily.  Materials are dropped at the job site by Defendant's vendor, and Salesforce enables technicians to see their job assignments and to record their work hours remotely, without having to report to the shop. (Larson Dep. 80:7–10, 19–21).  Plaintiff's memorandum mentions that Crush City's employee manual states encourages employees to use the designated parking lot.  (Pl's Mem. at 6).  This is not evidence that all technicians were required to report to the shop every day.  As mentioned above, there are all-company meetings and department meetings at the shop, and the company likely prefers the employees to use the parking lot on those occasions.

The only testimony that technicians had to report to the shop comes from Morgan's vague testimony that:

> A . . . I was told my first day of employment that I needed to be at the shop or a ride share to hop in with my foreman or the van that we were talking. [sic] Every other employee that I had mentioned had also been told that they need to be at the shop.
>
> Q. Or a ride share?
>
> A. Or a ride share, yeah.

(Morgan Dep. 104:18–104:1). When asked how it was determined whether he had to meet at a shop or pick people up at a ride share, Morgan simply stated, "the job, people's distance from home, I guess." (Morgan Dep. 106:4–5). Accordingly, employees did not have to report to the shop every day, even taking Morgan's own testimony as true.

Smith testified that it was Morgan who informed him whether or not he had to go to the shop in the morning, not a supervisor. (Smith Dep. 101:20–102:8). Morgan arranged for Smith to ride to the shop with him. (Smith Dep. 21:2–12). No supervisor ever instructed Smith how to get to work. (Smith Dep. 32:6–14). Although Smith worked in the Decking Department at first, it was Morgan who arranged for Smith to meet his Decking foreman at the shop. There is no evidence that Crush City required any other department to meet at the shop every day.

Contrary to Morgan's testimony, Pressley testified that if he had been on the company's insurance, he would have been able to drive the company vehicle home right from the job site, and then just go straight to the job site in the morning versus picking up the company van from the shop. (Pressley Dep. 15:4–10). Siding Manager Ben Miller

23

sent Pressley the job site address so he could just drive to the site. (Pressley Dep. 14:22–24). Pressley would meet Morgan and Smith at the job sites. (Pressley Dep. 14:5–15). Pressley never testified that he was required to go to the shop both before and after working at the job site each day.

There is no evidence of a company-wide policy that required employees to report to the shop at the beginning and end of every work day. At most, there is evidence that one supervisor in the Siding Department may have told Morgan he had to report to the shop or a ride share if he wanted to ride in the company van. Miller was the one who mentioned that Morgan could pick up Reid while Morgan was in jail. (Morgan Dep. 38:14–39:2). However, there is no evidence that this was required. Crush City simply did not want a company vehicle parked outside the jail every day. A mere suggestion that one incarcerated person and one person whose license was suspended work together to get to work is not evidence of a company-wide policy to deprive employees of compensable drive time by requiring everyone to report to the shop every day. The actions of one supervisor are not enough to find that all the company technicians were victims of the same policy or practice. *See Hawkins v. Alorica, Inc.*, 287 F.R.D. 431, 440–441 (S.D. Ind. 2012) (denying FLSA class certification because there was no evidence of a company-wide policy requiring off-the-clock work—the evidence was that only certain supervisors required employees to perform pre-and post-shift work.). There is no evidence of a companywide policy that required employees to report to the shop at the beginning and end of every work day.

24

###### i.   **Other Drive Time Allegations.**

Plaintiff's memorandum points out that Smith failed to claim drive time from the shop to the job site after a meeting one day, when Morgan did claim the drive time. (Pl's Mem. at 14). However, Smith testified that Morgan was the one who told him how to enter his time, and whether or not to enter drive time. Smith never asked a supervisor about how to enter drive time and only relied on Morgan's direction. (Smith Dep. 61:16–62:9). Additionally, the written drive time policy explicitly states that this is allowable drive time, and Crush City's Human Resources Manager testified that Smith should have claimed the drive time if it was after a meeting. (Larson Dep. 131:1–15). Morgan clearly understood that he was supposed to claim drive time, and Smith's misunderstanding of the policy appears to have come right from Morgan, and not Smith's own discussions with managers.

Morgan testified he was told not to record drive time by one Siding supervisor, Ben Miller, and his failure to record drive time was based upon that supervisor, and discussions in annual Siding department meetings, and not the written policy applicable to all Crush City employees. (Morgan Dep. 102:21–103:7). However, it appears that Morgan is complaining about carpooling from the shop to job sites, regardless of whether he loads materials or receives instructions at the shop. (Morgan Dep. 103:17–104:6). This is strange, because Morgan is the one that arranged multiple different driving situations for himself and others. He instructed Smith to carpool with his decking crew, instructed other employees to pick him up from jail, and arranged for an unlicensed employee's (Reid's) transportation to work.

Travel time to and from work on a regular work day is not compensable.  *See Irwin v. State of Wis.,* 998 F.2d 1016 (7th Cir. 1993), "[T]he FLSA does not consider travel time between an employee's home and work station to be compensable time."*; Reich v. New York City Transit Auth.*, 45 F.3d 646, 651 (2nd Cir. 1995) (observing that the Portal to Portal Act, which amended the FLSA in 1947, sets forth exemptions that "properly protect employers from responsibility for commuting time and for relatively trivial, non-onerous aspects of preliminary preparation, maintenance and clean-up."); 29 C.F.R. § 785.35 (noting that regulations governing the Portal to Portal Act provide that same-day travel time on a regular workday is not compensable under the FLSA.)  The use of a company-provided vehicle does not, alone, make an ordinary commute compensable, provided that "the use of such vehicle for travel is within the normal commuting area for the employer's business or the establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative as such employee."  WHD Opinion Letter, FLSA2018-18, 2018 WL 2348797, at *4 (Apr. 12, 2018) (citing 29 U.S.C. § 254(a)).  Job sites that are half an hour to two (2) hours from the employer's office do not make commute time compensable either if those sites are within "the normal commuting area for the employer's business."  *Id.*  (finding that employer's technicians' drives from home to office that take one (1) hour or more not compensable).

There is no evidence of a companywide policy to unlawfully deprive employees of compensable drive time under the FLSA.

### c.   Plaintiff Is Not Similarly Situated To Other Employees.

"Factors relevant to the FLSA certification question include any disparate factual and employment settings of the individual plaintiffs, the various individualized defenses available to the defendant, and fairness and procedural considerations."   *Dekeyser v. Thyssenkrupp Waupaca, Inc.*, 314 F.R.D. 449, 456 (E.D. Wis. 2016).  Morgan is seeking to establish a class of all former and present Crush City Construction technicians and foremen.  However, Morgan is dissimilar from the putative plaintiffs in several respects.  Therefore, this case is inappropriate for treatment as a collective action.

While Plaintiff makes much of Defendant's use of dispatch and GPS records, no piece of data will ever be able to tell the Court whether a technician, for example, was driving the company vehicle, riding in the company vehicle, or driving his own vehicle. (Larson Dep. 106:1–18).   Consequently, to determine whether Plaintiffs are owed compensation for any alleged unpaid drive time, there would be nothing to substitute for day-to-day, case-by-case inquiries for the individual putative class members.  Additionally, "each employee's own subjective interpretation of his supervisor's directive would require an individualized, rather than common, approach." *See Hadley v. Journal Broad. Grp.*, Inc., No. 11-c-147, 2012 WL 523752, at *4 (E.D. Wis. Feb. 16, 2012).

### i.   Each Department Had Different Work Assignments and Schedules.

Crush City's construction departments have significantly different work duties and each department has its own supervisor that is responsible for explaining the drive time policy and for approving employee time sheets.  Decking, Siding, Roofing, Gutters, and

Windows and Doors entail vastly different projects, with different locations and completion times. Additionally, within each department there are sub departments that again have different job duties. Morgan stated that even for the Siding Tear-Off Department, "There's not a typical workday." (Morgan Dep. 32:3–7). He confirmed that this was true for all Crush City employees. (Morgan Dep. 32:8–11). Some departments, like Windows and Doors, had to transport materials to the job site more frequently than others. The departmental meetings were held at different times, and different information was given at each meeting. The proposed class members encompassing every construction department are not similarly situated.

### ii.   Driving Arrangements Varied from Technician to Technician.

Within each crew within the various departments, there are different arrangements regarding company vehicles. There is no evidence that the putative class members are similarly situated regarding their drive time claims.

The driving arrangements of Morgan's siding tear-off crew varied immensely. Morgan chose to meet his crew at the shop, but the testimony is that it was not typical for every crew to meet at the shop. (Larson Dep. 80:19–21). Smith did not have his own personal vehicle, so Morgan arranged for Smith to meet his foremen at the shop. Additionally, Smith was under age twenty-one while working for Crush City. Because of his age, he was only supposed to drive company vehicles in emergencies. (Smith Dep. 99:24–100:3). Smith testified his crew members often did not want to drive, so Smith ended up driving, even though he knew he was not supposed to. (Smith Dep. 100:3–25). Smith did not address this issue with his manager. (*Id.*) The crew just decided amongst

themselves who would drive each day.  (Smith Dep. 39:15–16).  This is not evidence of a companywide policy, and it appears driving arrangements changed daily.   Similarly, Pressley was not approved through Crush City's insurance, so he should not have any claims based solely upon driving a company vehicle from home to the jobsite, and Pressley testified he was aware he was allowed to just drive his personal vehicle to the job sites.

### iii.   Morgan's Commuting Experience is Unique, and he is Unqualified to Represent a Class.

Morgan's experience with transportation while working for Crush City is remarkable in the fact that he claims time driving his own son, and time spent commuting to work from jail, as unpaid travel time.  Morgan is not similarly situated to the putative class members with regard to his uncompensated drive time claims.

### iv.   Morgan's Handful of Bonus Payments are not Enough to Create a Class.

Morgan's attorney claims that Morgan is entitled to additional overtime payments because of two bonuses he claims would have increased his regular rate of pay for overtime purposes.  When asked about this claim in his deposition, Morgan did not think it was part of the lawsuit.  (Morgan Dep. 157:1–3).

Plaintiff received three nondiscretionary performance bonus payments during his entire time with Crush City.  It appears he may claim to have not received proper over-time compensation for two of those three bonuses over the approximate 16 months he was employed there.  There is no evidence or argument that any other Crush City Technician is eligible for additional overtime payments because of nondiscretionary bonuses.  The testimony revealed that the bonuses for each department differed.  Morgan testified he got

bonuses for tearing of "so many thousands of dollars" before he hit a bonus. (Morgan Dep. 156:21–25). Since there were only four people in the Siding tear off crew at a time, this bonus system does not apply across the proposed class. Additionally, there is no evidence that other departments regularly worked overtime and received overtime payments. Morgan's counsel's unsupported belief that other technicians in other departments regularly received bonuses during time periods when they worked in excess of 40 hours per week and for which they are now entitled to additional overtime compensation is not sufficient to show that Morgan is similarly situated to other putative class members. *Adair*, No. 08-C-280, 2008 WL 4224360, at \*9; *see also Mares v. Caesars Entm't, Inc.*, No. 4:06-cv-0060-JDT-WGH, 2007 WL 118877, at \*3 (S.D. Ind. Jan. 10, 2007) (finding that plaintiff did not carry the burden of showing that plaintiff was similarly situated to other putative class members when plaintiff's belief that similar policies and practices applied to other employees was based on mere conversations with others). Morgan's one-off bonus payments are not enough evidence to create a class. He is not similarly situated to the putative class.

### 4. **Certification will not Facilitate Judicial Economy**.

At all times, the touchstone for conditional certification is judicial efficiency. *See Hoffmann-La Roche*, 493 U.S. at 170–71. District Courts have wide discretion in determining whether to authorize notice, and in exercising this discretion, the Court should consider that the opt-in mechanism established by the Portal-to-Portal Act was meant to *limit* employees' ability to proceed collectively. *Id.* at 173 (the 1947 FLSA amendments were enacted to "free[ ] employers of the burden of representative actions").

Thus, the fundamental inquiry is whether judicial economy would be promoted by certifying a class.

Here, the nature of Plaintiff's drive time and bonus claims and what each putative class member would need to prove at trial would render a collective action judicially *in*efficient. *See Xavier v. Belfour USA Grp., Inc.*, 585 F. Supp. 2d 873, 877 (E.D. La. 2008) ("Courts require some identifiable facts or legal nexus that binds the claims so that hearing the cases together promotes judicial efficiency."); *Andersen v. Wells Fargo Fin., Inc.*, No. 4:11-cv-00085, 2012 WL 12871958, at *19 (S.D. Iowa Feb. 6, 2012) (court is "required" to determine whether a collective action would result in an unmanageable trial). The Court would have to consider, for each technician, for each workweek, *what* that technician did before and after they were at the job site, *and* for how long such "work" was performed so as to determine whether it would push that individual's hours to over 40 for the week (and by how much). *See* 29 U.S.C. § 207(a)(1)-(2); *see generally England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 511 (M.D. La. 2005) (assessing damages would "require a case-by-case inquiry, thereby rendering it impossible to try this case as a collective class"). Matters of proof become even more difficult when alleged off-the-clock work takes place out in the field away from supervisors. Further, even if off-the-clock work were found to have taken place, and there is a basis for employer liability, time spent on the activities at issue might be administratively burdensome to record and *de minimis.*

Testing the credibility of each technician also will be crucial. *See Goldberg v. Kelly*, 397 U.S. 254, 269 (1970) ("[D]ue process requires an opportunity to confront and cross-examine adverse witnesses."). Proceedings thus far already have revealed that credibility

issues will loom large.  Morgan contradicts his own testimony multiple times.  Smith and Pressley both testified in their depositions that their sworn declarations contained significant errors.  A class action could not sufficiently account for these credibility considerations.

In sum, this case is not one in which it would promote judicial economy to resolve the potential plaintiffs' claims in one proceeding. Rather, "it would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated." *Adair*, 2008 WL 4224360, at *4 (citations and quotations omitted) (also explaining the Seventh Circuit's observation that discovery following conditional certification may impose a "tremendous financial burden to the employer") (citations omitted); *Hadley*, 2012 WL 523752, at *4 ("[T]o the extent the allegation is that the company had a policy *requiring* employees to work without pay, the allegations are so individualized that there would not likely be any common answers achieved through collective litigation.") (emphasis in original).

## B.     NUMBER OF PLAINTIFFS / OPT-INS IS INSUFFICIENT.

Even if Plaintiff is able to meet his colorable basis burden, he still must provide evidence that other similarly situated employees want to opt-in.  *See Pecor v. N. Point EDC, Inc.*, No. 16-C-1263, 2017 WL 3723600, at *3 (E.D. Wis. June 9, 2017) ("this Court agrees with those courts that require evidence that other similarly-situated individuals desire to opt into the litigation.").  Without evidence that others want to opt-in, conditional certification has no purpose and must be denied.  *Id.*  While there is no magic number as

to what constitutes necessary "interest" in the claim, one named plaintiff is insufficient. Evidence that numerous potential plaintiffs made no effort to join the lawsuit when informed about it counsels against certification. *Hadley*, 2012 WL 523752, at *5 (citing *Dybach v. Fla. Dep't of Corrs.*, 942 F.2d 1562, 1567 (11th Cir. 1991). To date, there is one named plaintiff and really nothing more. Morgan has spoken to other current or past Crush City technicians, including: Cody Lee, Devon Hoyt, Michael Funk, Mitchell Larson, Zach Iverson, Reid Filiatreux, Benjamin West, Duane Payne, Kevin Wedlund, Ben West, TJ Klund, and no one else wants to join. (Morgan Dep.142:25 –146:12). Additionally, both individuals for whom a consent to opt in was filed, testified in their depositions that they want no part in this lawsuit and do not want to sue Crush City. (Pressley Dep. 19:21– 22; Smith Dep. 91:7–12). Pressley testified that he was only paid using number of hours worked, so he is not even a potential collective member for the bonus compensation collective. (Pressley Dep. 22:19–24).

## C.   JUDICIAL NOTICE SHOULD BE DENIED OR IN THE ALTERNATIVE – LIMITED IN SCOPE AND CLARIFIED.

29 U.S.C. § 216(b) permits courts, where appropriate, to prescribe the terms and conditions of communication from named plaintiffs to potential putative class members by facilitating notice of the collective action. *Ehmann v. Pierce Mfg., Inc.*, No. 16–C–247, 2016 WL 5957275, at *4 (E.D. Wis. Oct. 13, 2016) (citing *Hoffmann-La Roche*, 493 U.S. at 172). Judicial notice "serves the legitimate goal of avoiding a multiplicity of duplicative suits and setting cutoff dates to expedite disposition of the action." *Hoffmann-La Roche*, 493 U.S. at 172.

Judicial notice is not automatic.  *Ehmann*, 2016 WL 5957275, at *4.  This notice is "distinguishable in form and function from the solicitation of claims. . . . Courts must be scrupulous to respect judicial neutrality . . . [and] take care to avoid even the appearance of judicial endorsement of the merits of the action."  *Hoffmann-La Roche*, 493 U.S. at 174.

Accordingly, Plaintiff cannot show why judicial notice will do anything but attempt to stir up litigation and complicate what should be a straight-forward single plaintiff FLSA travel time case.

### 1.  <u>In the Alternative, the Scope of the Proposed Notice Should Be Limited.</u>

Alternatively, if conditional certification and judicial notice is granted, Defendant objects to the proposed notice [ECF 20-1] and asks that it be modified to make it timely, accurate and informative.  *See Kelly*, 256 F.R.D. at 631–632.  Defendant respectfully requests the following modifications to Plaintiff's proposed notice.

#### a.    The Notice Should Be Narrowed.

The putative class should be narrowed to only siding technicians, and the dates should be narrowed to only Morgan's dates of employment with Defendant.  There is no evidence that any of the alleged unlawful practices occurred outside of Morgan's employment dates or outside of the Siding department.

As stated above, Crush City's drive time policy is not unlawful.  It appears that Morgan and those working under him simply did not understand the policy and possibly did not record drive time when they could have.  Morgan testified he was told not to record drive time by one Siding supervisor, Ben Miller, and his failure to record drive time was based upon that supervisor, and discussions in annual Siding department meetings, and not

the written policy applicable to all Crush City employees.  (Morgan Dep. 102:21–103:7).  Miller was the one who mentioned that Morgan could pick up Reid while Morgan was in jail.  (Morgan Dep. 38:14–39:2).  Crush City did not require carpooling from the shop or picking up employees from ride share locations.  (Larson Dep. 79:1–5).  Additionally, Morgan was the one who informed Pressley and Smith that they could not record drive time while riding.  There is no evidence this misunderstanding or misinterpretation of the written drive time policy occurred outside of Morgan's crew.  The notice should be narrowed to only Siding department technicians.

The notice should also be narrowed to only include Morgan's dates of work with Crush City because there is no evidence this practice occurred outside of Morgan's crews, and because Morgan does not have standing to represent collective members outside of his experience.  *See Maddison v. Comfort Sys. USA (Syracuse), Inc.*, No. 517-CV-0359 LEKATB, 2018 WL 679477, at *8 (N.D.N.Y. Feb. 1, 2018) (Limiting FLSA certification notice to time frame Plaintiff was employed by Defendant ("Plaintiff cannot claim to have been injured by any underpayment made by Defendant to its employees before or after his dates of employment."))

Morgan started working at Crush City on May 15, 2017.  (Morgan Dep. 74:11).  Morgan left employment with Crush City on September 28, 2018.  (Morgan Dep. 140:7–8).  Accordingly, the collective must be limited to May 15, 2017-September 28, 2018.

In the alternative, the notice must be revised to remove the language, "within the three (3) years prior to this action's filing."  The notice should only extend back three years prior to the date of the notice, rather than to the date of filing of the

Complaint.  Based on the statute of limitations, courts have recognized that class certification is appropriately limited to workers employed by the defendant up to three years before notice is approved by the court.  *See Campeau v. NeuroScience, Inc.*, 86 F.Supp.3d 912, 918–919 (W.D. Wis. Jan 15, 2015); *Kelly*, 256 F.R.D. at 633 (certifying class three years before the date of the notice).

### b.    The Notice is Inaccurate.

The proposed notice is contains typographical errors which should be corrected prior to the Court's signature.  For example, the notice states that it has been authorized by the Eastern District of Wisconsin, and discusses "Defendants" when there is only a single Defendant.

### c.    The Notice should be on Plaintiff's Counsel's letterhead, and the Case Caption Should Be Removed.

In examining and approving any proposed notice, the Court must be careful to avoid the appearance of "judicial sponsorship" or a "judicial imprimatur." *Hoffmann-La Roche,* 493 U.S. at 174; *see also Woods v. N.Y. Life Ins. Co.*, 686 F.2d 578, 581 (7th Cir. 1982). Because of this, the Court should order that the case caption be removed from the notice and that the notice instead be placed on Plaintiff's attorneys' letterhead.  *See Alexander v. Caraustar Indus.*, No. 11-c-1007, 2011 WL 2550830, at *8 (N.D. Ill. June 27, 2011); and *Heuberger v. Smith*, No. 3:16-CV-386-JD-JEM, 2017 WL 3923271, at *7 (N.D. Ind. Sept. 7, 2017) (ordering same).

### d. The Notice Should be Mailed, and Not Posted at Crush City's Work Locations.

The Court should not order Crush City to post the notice in its offices, as, absent evidence that the mailing of notices is ineffective, such a method of notice is unnecessary and overly intrusive. *Howard v. Securitas Sec. Servs., USA Inc.*, No. 08-C-2746, 2009 WL 140126, at *9 (N.D. Ill. Jan. 20, 2009). If Plaintiff cannot demonstrate why posting is necessary, the Court should deny Plaintiff's request to order Defendant to post the notice. *See Heuberger*, 2017 WL 3923271, at *7; *Ehmann*, 2016 WL 5957275, at *5. Plaintiff has not shown why it is necessary to post notice, and only relies on cases from outside this circuit to support the request. (Pl's Mem. at 28, fn 29). Accordingly, Plaintiff's request to post notice at Crush City's office should be denied.

### e. The Notice is Misleading.

#### i. Effect of Joining or Not Joining This Action.

The proposed notice should also state that by opting-in, the individual may be held liable for Defendant's attorneys' fees and costs of the action. See 29 U.S.C. § 216(b). This paragraph should be amended to clarify, "if there is no recovery by Plaintiff, you may be liable to Defendant for the costs of the action pursuant to Federal Rule of Civil Procedure 54 and 28 U.S.C. § 1920."

The proposed notice should also inform putative class members that they may be required to participate. The first sentence of the second paragraph should be amended to read, "If you join this action, you may be required to provide information or otherwise participate in it by providing in-person sworn testimony at a deposition and trial."

## IV.   <u>CONCLUSION</u>

Based upon the foregoing, the Court should deny the Motion in its entirety.


Dated: August 5, 2019                    <u>s/Martin D. Kappenman</u>
                                         Thomas R. Revnew (#1023265)
                                         Martin D. Kappenman (MN #320596) Pro Hac Vice
                                         SEATON, PETERS & REVNEW, P.A.
                                         7300 Metro Boulevard, Suite 500
                                         Minneapolis, MN 55439
                                         Telephone:  (952) 896-1700
                                         Facsimile: (952)896-1704
                                         trevnew@seatonlaw.com
                                         mkappenman@seatonlaw.com

                                         ATTORNEYS FOR DEFENDANT, CRUSH CITY
                                         CONSTRUCTION, LLC